*417 THIS case came to a hearing in February 1811, and bavins; been very fully argued, the Court took time ° . consider. In October 1811, Chancellor Desaussured! delivered his decree.
*418 The complainant in this case filed a bill in this Court on the 30th July 1806, against Mr. Roger Moor Smith, his wife and Mr. Thomas R. Smith,
That bill set forth, that Mr. R. M. Smith became in-debtcd to the complainant between the month of March ^yan(j january jsoi, for goods, wares and merchandizes, to the value of 448Í. 9s. Sd. supplied to -the Roger and Ins wife, for the use of themselves and ant^ for the use and benefit of the estate, which had beon his wife’s property .previous to her interinar-riage with him as appears by the exhibit, A.
That the said estate, consisting of a plantation and sundry negroes was by deeds executed on 39th, and 1st March itó, conveyed previous to hRr intermarriage to the Rev. Thomas B'rost and Thomas R. Smith, intrust to and for the use of R. M. gmith and Ann his wife, as is provided in the'said deed, which is made-an exhibit in the cause.
*419 That the complainant applied to the said R. M. Smith for payment of the account without success. That be-jtng apprehensive, he had little or no estate of his¡ own,. and the principal ground of expectation of payment being from the trust ¿state, it was proposed and agreed by the parties, that the saidR. M. Smith and Ann iiis wife should secure the payment of the said debt o.ut of the trust estate, by giving their bond,, upon, the complainants extending the time, of' payment for three years. And accordingly the said. R.. M. Smith and Ann his wife, by and, with the intervention, and privity of Thomas.Frost one of the-trustees in the said' deed', (testified by his being a witness to the bond) executed and delivered, to complainant their joint bond on 14 January, 1801, in the penal su,m of 89.6L. 19.s,„ Ad. with condition for the payment of; 44,81. 9s^8d. with interest on. or before 1 January 1804, as appears by a copy of said bond, filed. That the Rev. Thomas Frost hath since dep.art-. ed this life. That complainant hath, applied, to. s.aid R, *420 M. Smith for payment of said debt, and though he is in the receipt of the rents and profits of the estate, he hath neglected to pay the same. Complainant is apprehensive of losing his debt, and prays relief; and that the trust estate may be decreed to be liable to this debt; ag f01, tjic proper debt of the said R. M. Smith, or of the said Ann Smith, his. wife ; and as if the said estate was not settled as aforesaid, and as if she were a feme sole, more especially as the consideration thereof was in a great degree for necessary articles, which went to the use of Mrs. Smith and of the trust estate.
The exhibit A. which is the account, is of sundry articles, chiefly for family use, for the use of a lady, and for the use of a plantation and negroes; and some articles for Mr. Smith’s personal use. The exhibit B. is a copy of the deed referred to by the bill, It is a conveyance of a tract of land and 47 negroes, a part of Miss Downs’s estate to the Rev. T. Frost and Mr. Thomas R. Smith, in trust, and with a proviso, that if the heirs, &c. of the said R. M. Smith should within 6 months af *421 ter bis decease, pay over to the, saRl Aim Downs his intended wife, in case she, shall. ;survive, him, the sum g 22,000, with interest thereon from the, day - gf' his death, and,provided also that the said R.. M.; Smith, (if he survived her) and his heirs, &c. should pay the said sum of $ 22,000 to such person or persons as; she should give and.bequeath the same to, by her last wiljl and testament, executed in the presence of two witnesses (which last will the said R. M. Smith covenants to consent and agree to) then the said conveyance of said estate should be null and void.. , ■
There-is.a clause in the deed authorising the said R, M. Smithto sell and convey the said plantation and negroes, with the consent in writing of; the. trustees , or the survivor of them, provided; the>said lit M. Smith should secure the said sum of g,22,000 to the said Ana Downs, as in said deed, by a mortgage of. an adequate real and personal estate. . , ,
The defendant-R. M. Smth and Agn his wife, put in *422 a joint answer to this bill, admitted that R. M. Smith did purchase of complainant the goods in bill mentioned* aT1d being- unable to pay for them, he did at the request, 0f complainant prevail on his wife to join him in execute ing the bond mentioned in said bill. And the bond was witnessed by the late Rev. Thomas Frost, one of the trustees of the marriage settlement of the said Ann. But they the defendants cannot admit that the signature of the said Thomas F-rost was intended to signify his consent, that the property under the settlement should be charged with the payment of the said bond. On the contrary, the said defendant R. M. Smith saith that the said Thomas Frost was induced to consent to the said Ann’s joining hinv in the bond by the declaration of the obligee, that her signature was desired only for the purpose of having a claim upon her in case of the death of the said Roger.
The defendants admit that such marriage settlement was executed by them as is set forth in the said bill. But whether by virtue of the said settlement, and the, act of executing the said bond,, the attestation thereof by one of the trflstees, the property settled is chargeable with the debt and liable to be sold, for that purpose, is submitted to the judgment of the Court.
The answer of Thomas Rhett Smith,, the surviving trustee, admits the marriage settlement as. stated by complainant. Defendant states that he is ignorant of *423 "the transactions between the said R. M. Smith and the Complainant. Bat he insists that it appears by the complainant’s own shewing, that the contract for the ■goods was originally with R. M. Smith alone, and that the credit was given personally to him, and that it appears to have been an after thought to make Mrs. Smith and the property settled amenable to the payment of his debt, by getting her to join her husband in a bond to complainant, witnessed by the trustees.
This defendant cannot admit that the trustee, Thos. Frost, intended by his signature to subject the trust property to the payment thereof, and thus so far to destroy the trust confided to him $ but supposes it to have been an inadvertent act. But if the said Thos. Frost did intend thereby to consent to charge the trust property his act was a mere nullity, as the trust was confided in him and this defendant jointly, and neither had a right to act without the other, and this defendant denies that he ever concurred therein. And that even if this defendant had concurred in the act of his co-trustee, for the subjecting the property to the payment of the debts of R. M. Smith, the husband, or to any dispo--■sition of his wife for his accommodation other than in the mode pointed out by the settlement, to wit, by deed in the nature of a last will, executed in the presence of two witnesses, the Court would have restrained them, and refused to sanction the measure, as it would be a departure from the intent and object of the settlement.. And the defendant, Thomas R. Smith, further insisted that under the said settlement the said R. M. Smith is permitted by a special covenant to sell and convey the property settled with the consent of the trustees or the survivor of them, to be signified in writing on condition that the said R. M. Smith would first secure to his said wife the sum of g 22,000, by a mortgage of real and personal property, equivalent to what he should sell. Whence the complainánt would infer a right to charge the premises by the joint obligations of the said R. M. Smith and Arm hi? wife. And so equivocal and irfom* *424 al an act oil the part of the trustee, as that of his at-^es^nS the s£dd obligation, without taking any security from the said R.. M. Smitli, for the paylnent of the said g 22,000 to the said Ann, under'pretence that'she has' waved her right to said security ; whereas' by the set-£|emen£ jier agency ih relation to such disposition is no where stipulated for, or in any manner sanctioned. Defendant insists that the said bond so far as it imports an obligation from the said Ann, is absolutely null and void ; she having been a feme covert when it was executed, and having no power under her marriage settlement to come under such an obligation ; and that having no separate estate or interest subject to her individual control, she cannot be looked upon by this Court as a feme sole, as the complainant demands in relation to this debt. And she had no separate estate in relation to which the contract of a feme covert could be made obligatory on her. And this defendant insists that the decrees of this Court in cases somewhat analgous to this, are limited to instances where separate rights are vested in the wife and free agency allowed her, and trustees are interposed not to restrain her will, but on the contrary formally for the purpose of leaving that will free, and to confer on her the privileges of an un-marriedwoman.
That the case now under consideration falls under that larger class of cases, where the rights of man and wife are mingled, and trustees appointed to guard the wife against her own indiscretion, and the effects of her ignorance of business, and to protect her against any acts of her husband derogatory to her rights, or into which she may be persuaded or driven by him, and by such protection to secure a portion of her estate for her comfort. That in such case it would be a solecism in terms and principles to say that the joint act of the husband and wife can overturn the conditions and limitations of their marriage settlement.
That no decided cases had gone further than to decree that the trustees should apply the proceeds of the sepa- *425 fate estate of the feme covert to the payment of the debt.
I must remark upon this answer, that though it is drawn with great skill and ability, it is in some degree objectionable, inasmuch as it is too argumentative, if we depart from the plain Barrative.forms heretofore in use, which, state the .essential facts concisely to. the Court, o,ur pleadings will degenerate into the loose forms' of the memoirs and plaidoyersin use on the continent of Europe, the inconvenience of which would be sensibly felt hereafter. I would recommend to the solicitors to attend to this-remark, and to adhere, to the ancient usage of the Court. .
After these pleadings had been filed, Mr- R. M. Smith departed this life, intestate j and B. B. Smith, administered on his estate. Whereupon the complainant filed .a supplemental bill and of revivor, and made the administrator a defendant, and demanded an account of the personal estate of the said 11. M. Smith,, and to have the same applied to the payment of the compainant’s demand : and also to have, satisfaction of the said debt in the bill mentioned, out of the separate estate of the'said Ann Smith, who hath survived lier husband.
To this supplemental bill the said B. B. Smith answered,, that he admitted the former proceedings in the cause, and that B. M. Smith had since departed this life intestate, and that said B. B. Smith had administered thereon. ‘
. That in the opinion of the defendant the estate of the said R. M. Smith will not he sufficient to pay the debts which he owed in his lifetime, or at the time of his death. Indeed he thinks that after payment of the sum of $ 22,000 to the widow, with interest according to the marriage settlement, there will hot remain enough to pay the judgment debts standingiagainst the said'S. M. Smith.
That after the defendant had regularly administered, he caused a sale to be made of the effects of R. M. Smith not comprehended in the marriage settlement, and the *426 same amounted to g 432, and no more, as appears fey account sale, which forms exhibit A.
The other defendants in their answer to the bill of re» vjvor admitted the former proceedings.
At the trial of the cause, Mr. Charles Edmondson, a witness for the complainant, proved the' execution of the bond in question, which was given for the amount of a running account.
Mr. Frost was the friend of Mrs. Smith, and said the bond would be given, if time of payment should he ex* tended. He said he was trustee of the lady, and would agree to the bond on those terms.
This was agreed to by the attorney of Mr. Ewing, and the bond was executed and Mr. Frost witnessed it. The voluntary payment hy Mr. Smith was distrusted and doubtful, and it would have been put in suit immediately to coerce the payment of the account. But on Mr. Frost’s proposition it was agreed to accept Mr. and Mrs. Smith’s bond, and Ms assurances were relied on. It was Mr. Frost who came to solicit indulgence, and procured it on the proposition of the bond. Mr. Frost knew of the account, and witness thinks Mr. Frost acknowledged that most of the goods were obtained for Mrs. Smith.
Entire reliance was placed on the goodness of the debt, when the bond was given.
Mi'. B. B.. Smith, witness for the defendant, stated that the property of Mrs. Smith was considered to be double the amount of the sum secured by the settlement, to wit, the $ 22,000, There were two plantations and forty-seven negroes, bonds, &c. &> One of the plan* tations has been sold by Mr. Smith and it went to pay Ills debts. Other property was substituted for the land sold ; thinks it was sold for 25,00k
He thinks B, M» Smith was insolvent at the time of' the contract. And does not believe the property now left is Worth more than the $ 22,000, secured hy the settlement.
This case involves a principle of great importance, *427 Which has been much agitated. I have therefore reviewed all the cases and formed my opinion upon a careful examination of them. In this I have been greatly assisted by the very able argument of the counsel on both sides of this cause, which left me littje more to, do, than to examine and compare their authorities; , and arguments, and to draw ipy conclusions from them.,
The points insisted upon by the complainant were,
1. That the defendant,. Mrs. Smith, had a separate estate ia the debt secured to be paid her by her husband under the deed.
2. That in relation to that separate estate she could act as a feme sole, and her acts might charge the same at her will and pleasure, unless specially restrained hy the deed creating her separate estate. -• .
S. That she had in this case hy joining her husband Jn the bond to the complainant so expressed her intention to charge the separate estate, as would bind it to the extent of its value. And this was not prevented by any thing contained in the deed creating and securing the separate estate.
As auxiliaries the complainants added,
4thly, That if the assent of the trustees was necessary, (which they denied) one of the trustees had expressed his assent by signing the bond as a witness.
And 5. That the bond was given for necessaries for the family, articles for Mrs. Smith’s own personal use, and articles for the use of the trust estate. And time was given for the payment,, which enabled Mr, Smith to apply the rents and profits which were clearly liable, to the payment of the other expenses and support of his family.
To this it was answered on the part of the defendant,
1. That the debt of $ 22,000, secured to be paid by the husband to the wife in this case, was not such a separate estate as, she could charge, admitting that wives have that power generally over separate estates.
2. That a married woman has no power to act as a feme sole, and by her acts to charge the separate estate, *428 unless such power be expressly given her by the: deed creating the separate estate. That no such power was given in this case,! But there was a line marked out, -by whichalone she could walk and act, and dispose of this property-.'
3- Thát eyen if Mrs. Smith couldhaVe' charged this estate, the act of signing abondwith her husband, was not a-properAbode of charging, but was a mere nullity at law, and this Court would not set up or enforce against a married woman, a paper of this kind, which the party could not enforce at law. ‘ :
4.: That the assent of the trustees was necessary in all cases ; and was particularly made so by the deed in question. And that one trustee only having assented (and that in an irregular way) it could not bind or give effect to Mrs. Sinitb.’s bet.
5. That if the bond was given for necessaries for Mrs. Smith, and the trust estate, it could not make her liable, as the husband (who got a considerable'-fortune by her) was bound to maintain her; and as he had the use of the rents and profits, to enable him to support the expenses of his family, and pay debts incurred for the use of the trust estate.
To all this it was added that this Court was peculiarly anxious to support the lights of femes covert, and would not sanction any acts which tended to defeat their interest in separate estates, which was a danger to which they were much exposed by their situation ; as few women could resist the authority of harsh, or the persuasion of affectionate husbands.
The Court would, therefore, guard them against themselves.
Other topics of argument were resorted to on both sides, but I believe they may all be comprehended under the points stated above.
I In examining the authorities cited, I shall take them in the order of time, which will enable us to sep when, as well as how, the doctrine in question was established; *429 What objections have been made at various times, and how they have been settled.
We shall be able to deduce from them at the conciasion matter to guide us upon all the points now in litigation. The first case of importance is that of Norton v. Turberville, reported in 2 P. Wms. 144, which was decided by the master of the rolls in 1723. This was the case of a feme covert, who had a separate estate. She borrowed money and gave her bond. She ten years afterwards made her will, gave legacies and made exe-cufoi’S, and afterwards died.
It was objected that her bond, being a feme covert, •is void at law, and she is not bound by it. And then the matter rested as a loan of money to the feme covert, which’ demánd is barred by the statute of limitations.
It was decided that though the bond was so far void as not to be suable at law, the demand could be supported in equity so as to charge the separate estate.
The next case which I notice is that of. Stanford v. Marshall, 2 Atk. 68, decided by the master of the rolls in 1"'40. In that case a father by deed created a trust of real estate, and directed the rents and profits to be paid to his daughters, whether sole or covert, for their separate use, either into their own hands, or into those of any other person whom they might appoint. The daughters joined their husbands in bonds for money loaned to the husbands. The trustees refused to pay, and the creditors brought a bill to compel them to pay the rents and profits of the real estate.
The Court said the daughters had an absolute power over the rents and profits, and could create any lien they pleased upon their interest in the estate, and therefore ordered the trustees to pay the rents and profits of the trust estate to the Creditors.
The next case is that of Parteriche and Poulet, 2 Atk. 383, decided by Lord Hardwicke in 1742. He stated that a feme covert having a separate estate shall be considered so far a feme sole, that if she advances money out of her separate estate by way of loan, to her bus- *430 to pay his debts, or joins with him in charging her separate- estate to relieve his estate, she shall, as her estate is liable to the mortgage she has given, be looked upon in this Court as a creditor, and entitled to be repaid out of her husband’s estate. ' .
The next case is that of Wilford and Beasly, 3 Atk. 503, decided by Lord Hardwicke, in 1747, which only establishes that a person interested, subscribing a deed as a witness only, knowing the contents, is a sufficient signing within the statute of frauds.
The next case is that of Darly v. Darly, 3 Atk. 999, decided by Lord Hardwicke, in 1746, by which it was established, that where an estate is given to a husband for the use of the wife, he may be considered as a trustee far her separate use. For no technical words are necessary to make it a separate ti*ust; and the word “ livelihood,” is sufficient to shew the intention of the giver, that it should be to her sole and separate use.
The next case in order is that of Allen v. Pap worth, 1 Ves. sen. 163, decided by Lord Hardwicke in 1748.
He held that if a feme covert having power to receive the rents and profits of an estate to her separate use, and to appoint them as she pleased, brings a bill jointly with her hushand for an account, and submitting that the profits should be applied to the payment of the husband’s debts, tire Court will decree it accordingly. And the bill to which she was a party without collusion, is as much an execution of her power, as an actual appointment would have been, and the profits shall be bound.
Then follows Hearl v. Greenbank, 1 Ves. sen. 298, ’9, 303, decided by Lord Hardwicke in 1749. He stated that it was a rule of the Court that a feme covert may dispose of personal estate given to her separate use, and subject to her disposal. As to the real estate, that requires more particularity. The wife bequeathed away the estate from the husband, and this was supported.
The next case was that of Grisby v. Cox, 1 Ves. sen. 317, ’18, decided by Lord Hardwicke in 1750. This is a very important case, in which we see the principles *431 which governed the Court, developing themselves more clearly, or at least more fully.
This was the case where on the marriage of a lady, an estate was settled in trustees to receive the rents and profits for her sole and separate use, and as she should appoint and direct, whether sole or covert. The wife hy deeds of appointment sells part to the plaintiff, and the husband covenants that the purchase should be free from incumbrances ; but the trustees were not consulted therein.. The bill was to have the effect of this bargain.
The wife insisted that the plaintiff had colluded with her husband to take away that separate power from her, and that the plaintiff had paid the money to her husband, though he saw this settlement to her separate use. Therefore he did not come into equity unexceptionably and on fair grounds. And that her friends and trustees ought to have been consulted. But the Lord Chancellor said it was impossible not to decree under the circumstances proved (for the wife did not famish any proof of collusion, or undue influence,) that the plaintiff should have the benefit of this purchase.
« For the ride of the Court is that where antj thing is settled to the wife’s separate me, she is considered as a feme sole; may appoint in what manner she pleases, and unless the joining her trustees is made necessary, there is no occasion for that.”
The wife might have made an immediate appointment for the benefit of her hushand, unless there was proof of undue influence over the wife, by ill treatment, or even by extraordinary kind treatment. Then a purchaser stands on stronger ground. The Court had reluctance to he sure to enforce the contract, but felt itself bound to do so in the case stated.
Soon after came the case of Peacock v. Monk, 2 Ves. sen. 190, decided by Lord Hardwicke in 1751. He there laid down the law of the Court to be, that as tp personal estate where there is an agreement between husband and wife before marriage, that the wife shall have to her separate use, either the whole of particular *432 her personal estate, she may dispose of it By an ac* in her life, or by will, as she pleases, though nothing is said of the manner of' disposing of it.
^n(j jp a wjfe with separate estate borrows money, anc* gives Ijer bond, this gives a foundation, to’ demand the money against her, out of her separate estate $ she being a feme sole as to that.
As to real estates, as the law regards the interests of the heir at law, more formality and more adherence to the power of appointment seems to be required. (See page 193.)
Then followed the case of Pawlet v. Delaval, 2 Ves. sen. 663, 9, decided by Lord Hardwickein 1755.
He there decided that a wife is barred from claiming her separate personal estate, which she with her husband and the trustees had called in from the debtors, and had loaned out again in the husband's name.
Lord Hardwicke said that it had not been determined to be the law of the Court that the intervention and consent of the trustee was necessary to support the disposal of the separate estate by the wife, (667.) Nor has it been determined that the wife may not dispose of her separate property even to her husband unless by consent in Court or intercession of friends. It is frequently done by matter in pais, and is supported by the Court, where no menace or imposition appears, if indeed the circumstances required by the trust, by which the act is to be done have not been pursued, the Court might say it should not take place. But here are no particulars required as to the mode of doing it.
In the case of Cartony v. Newman, decided in 1771, as cited in a note in 3 Bro. C. C. 346, a legacy had been given to the wife for her sole use, with a power of appointment by will and in default to her executors. It was ordered on her consent to be paid to her husband.
This was a plain departure from the mode of appointment pointed out by the testator, to wit, by the will of the wife j yet it was supported.
So in Clarke v. Piston, decided in 1777, at the rolls, *433 the wife’s separate estate, which she had power to dispose of from time to time, as she should choose, by any note under her h artel, was by her consent, without any appointment, atid merely by joining her husband in a bill, decreed to be paid over to the husband by the trustees. See 3 Brown, C. C. 346.
Fully as the doctrine has beert examined and applied in preceding cases, it received further examination in the case of Hulme v. Tenant. 1 Brown C. C. 16, decided by Lord Thurlow, in 1778. It had been previously argued before Lord Bathurst, who bad dismissed the bill. On a rehearing it came before Lord Thurlow.
The case was, that on the marriage of a woman, her freehold and leasehold estates were conveyed to trustees, to receive the rents and profits for her separate use, and to convey the estate to such úse as she should appoint by deed or will, under her hand and seal; and in default of appointment to her heirs and executors. The husband borrowed money of Mrs. Hulme and gave hie bond, in Which his wife joined, and so for a second sum Which the wife herself applied for. The bill was filed by the obligee against 'the husband, wife and trustee, to compel the payment of the bond.
The trustee did not join in the bond, nor assent* There was no mortgage, or any reference to the separate «state.
Upon full argrtment Lord Thurlow decreed the separate estate should be liable, particularly the leasehold estates.
He examinad the cases and concluded from them, that the proper rule was that laid down in Peacock v. Monk, that a feme covert acting with respect to her separate property, is competent to act in all respects as if she Was a feme sole. It is impossible he added, to say but that a feme covert is competent to act as a feme sole with respect to her separate estate, where settled to her separate use. And L’d Thurlow said he had no doubts as to these points. But the case before him required him to go further and to decide how far her general *434 personal engagement shall be executed out of her se-pavate property, that if she had by any instrument con» tracted that this or that portion of her separate estate should be disposed of in this or that way, she or her trustees might be decreed to make that disposition,
But if she enters into an engagement which would make a feme sole liable to the whole extent of the contract as to her person in every respect, it is clear such a general engagement entered into by a feme covert will hot bind Ixcr as such. But the decided cases have gone so far as to say, that the general engagement of the wife shall operate upon her separate personal property, and shall apply to the rents and profits of her real estate, and that her trustees shall be obliged to apply the personal estate, and rents and profits of the real to the satisfaction of such general engagement.
The principle is that if a Court of Equity says a feme covert may have a separate estate, the Court will bind her to the extent, as to making that estate liable to her own engagements, as payment of the debts, &c.
This case was much considered, and seemed to have settled the doctrine completely.
In the case of Fettiplace vs. Georges, 3 Bro. 8. The same subject was again brought before Lord TluirloW. and decided by him in 1789.
That was a case where personal estate was given by will to a trustee for the sole and separate use of a feme covert* The feme eovei’t by her will bequeathed the personal property to her niece, and died. Her husband sued for the personal property. It was contended for the husband that the 1000Í-. given by will to the wife for her sole and separate use could not be disposed of by her will, without the assent of tine husband. There was no power of disposal given her by the will of the testator, gave the legacy to the wife.
The Lord Chancellor said that all the cased shew, that the personal property where it can be enjoyed separately, must be so with all its incidents, and the jus dispohendi is one of them.
*435 The case of Lillia vs. Airey, 1 Ves. jr. 277, was de-tided by Lord Thurlow in March, 1791. He decided that the creditor of a feme co vert has a right in equity against her separate property, as far as that will go. She is a feme sole as to that, but not beyond it $ and her bond is a good acknowledgement of the debt, ,
In August, 1791, the same subject again came before, Lord Thurlow, in Pybus v. Smith, 3 Bro. C. C. 340. In that case the wife said in her answer that she did, not conceive when executing the deeds that site was con-; veying her life estate and interest, h.ut only the reversion in case of her death without issue. The master on reference reported that the deeds were read to. her.
The Lord Chancellor said if the point were open, ha should have thought that a feme covert who had a separate estate, should not part with it without an examination in Court. But a feme covert had been considered by repeated decisions with respect to her separate estate as a feme sole. If a feme sole sees what she is about,, the Court allows of her alienation of her separate property, and her conveyance of the whole to pay her husband’s debts, will be carried into execution.
If a parent intended to give a provision in. such, a way that she cannot alienate it, he saw no objection to its, being done. But such intention must be expressed in clear terms.
In Ellis and Atkinson, 3 Bro. C. C. 565, decided in 1792, it was again decreed that the separate estate of the wife subject to her disposition by deed or will, should be bound by her agreement and paid over to her husband. There being no. proof of undue influence, the Court carried the agreement into effect.
In this case the Chancellor considered, whether the wife could disppse of her eventual interest, arising from, her surviving her husband, and decided that she could. This was among the last of Lord Thurlow’s decrees. He resigned the great seal within three weeks after the decree in this case.
Jt might have been supposed that tisis long series of *436 cases bad settled this contested question. But it seeing that other Judges, struck with the facility with which married women could be induced to charge their sepa-* rate estates for their husband’s debts, or to alienate them .entirely for the husband’s benefit, and desirous to pro* .¡.jieiTi from their own indiscretion, endeavored to restrain this power.
Accordingly in the case of Socket and Wife v. Wray and others, reported in 4 Bro. C. C. 483, decided in 1793, the master of the rolls, (Sir R. P. Arden,) Lord Alvanly decreed, that where money is vested in trust for a married woman to pay her the interest for life to her separate use, and after her decease to such person as she should by any instrument in writing from time to time or by will appoint, she cannot dispose of the principal at once by deed,butby a revocable act only ; andhe refused to sanction a transfer of the property to the husband as the wife desired, by the bill filed by her and her husband.
Lord Alvanly said the eifect of the deed is, that the money should be paid to trustees to pay the dividends to the wife for life; and after her death, according to her appointment by will.
And the question is, whether under such a trust, she can waive the benefit of the deed, and give the whole capital away at once during her life, He said he thought she could not.
That though he i*espected the Chancellor who decided Newman v. Cartony, which was in point, he could not conform to that Case. He said that if a parent or other person giving property to a feme covert, as separate estate has given a power without restraint, the Court would act upon the property. But there was a restraint in this case; she could dispose only by a revocable act, a will. This case, notwithstanding the master of the rolls attempted to distinguish it from most of those before decided certainly militated strongly against them.
This was followed up in Hyde and Price, 3 Ves. jun. 437, decided in 1797, by the master of the rolls, who *437 decreed that where there is a trust in a deed t>f separate estate, to permit A. to receive the dividends of stock for the maintenance of the wife, she is not at liberty to grant an annuity out of the dividends. Her act is void. He admitted as in Hulme and Tenant that a feme covert is a feme sole as to her separate property j b ut not to charge herself personally. But-he thought a proviso :n for a wife, living in a state of separation, was not such a separate estate, as she could alienate or charge. She has no dominion over it. She could not bind her husband by her contracts. And if she alienated the maintenance, how could she live ?
This view of the subject was strengthened by the decision of the Lord Chancellor Rosslyn, in the case of Whistler v. Newman, 4 Ves. jan. 129, &c. in 1798.
This was a case of settlement of stock, the property of the wife, in trust from time to time to receive the dividends and pay them to the wife for her sole and separate use ; her receipt to be a discharge •, after her decease to her husband for life; after the death of the survivor to the children of the marriage; if no children to go according to her will.
The trustees with the privity, of the wife sold the stock, and paid the money to the husband, taking his bond of indemnity. He died insolvent. The widow and children filed a bill against the trustees, who were decreed to replace the fund, and to pay the dividends to file widow from the death of the husband.
She was prevailed upon to assent to the sale of the stock (as appeared by the examination of the wife, to which the trustees had a right.) But she stated it to have been partly by coaxing, and partly by bullying. (See p. 144.)
The Lord Chancellor In giving his decree, reviewed the cases, and seemed not wholly satisfied with Hulme and Tenant, and Pybus and Smith, which placed the .feme covert, having separate estate, so wholly on the footing of a feme sole as to the separate fund j because it, tended to defeat all the provisions intended for the be- *438 nellt of the feme covert. But he said that those cases were very different from the one before him. They were cases of creditors of the husband with whom the wife joined to secure the debt. And that as it might be necessáry to review the cases in relatioi^to the creditors, ()£ the husband, where the wife joined to secure the debt,. it would be a matter for consideration, whether the Court will do more than leave a legal right undisturbed,, but not to improve the security.
In the case before him the Lord Chancellor considered the trustees as having acted grossly against their duty. They made the wife witness to the bond, as evidence of her consent, which shews she was deceived and imposed upon. The cases have gone the length, that if a married woman has separate propei’ty, she may dispose of it, and the trustees arc hound to follow her disposition.
He regretted these decisions, hut he thought himself bound by them. And they were different from the case then under discussion. They w'ere cases of clear, substantial creditors dealing with the wife upon a security she thought fit to give them.
Then came the case of Moores v. Huish, 5 Yes. jun, 692, decided in 1800, by the Lord Chancellor Rosslyn,, in which the Court refused to enforce a security upon, rents and profits, settled in trust to receive and pay them yearly as received, to the separate use of a married woman. The Lord Chancellor said that the difference of Pybus and Smith, and the other cases is, that in those the wife had a power of appointment ,• whereas this is a mere trust to receive the rents and profits, anil pay them from time to time to the wife.
The case before him was not that of a creditor endeavoring to get a security for a just bona fide debt, but the purchaser of an annuity at a very low price, charged on the interest of the wife, who had applied to the trustees, and had full notice from them, that the husband was a ruined prodigal man, and the fund secured for the separate use of the wife. Bill of the creditors dismissed. These cases seemed to have shaken the *439 «Scctríné which the older cases appeared to have settled. Though in truth they were decided on peculiar' circumstances different from the former.
'But others have since arisen in which it has been considered wiser to adhere to the rule which had been established by a long series of decisions.
In the case of Sperling v. Rochefort, 8 Ves. jun. 164, 174, decided in 1803, the Lord Chancellor Eldon distinguished between the cases where nothing is settled to the separate use of the wife, and where there is a separate provision for her. And he recognised the doctrine that a feme covert is considered as a feme sole, as to her separate estate, as was decided in Hulme and Tenant- He said the cases, decided by Lord Hardwicke go very much to the extent that to all intents as to the separate property, the wife is to be considered as a feme sole.
That nothing could he more irregular than the act done by the wife in Hulme v. Tenant, nothing less like an execution of the power. Bui Lord Thurlaw held that the, instrument, which as a bond was nothing, and which was not attested as required by .the power, was a‘sufficient indication of the intention of the wife as to the separate property $ with regard to which she must upon the authorities be deemed a feme sole.
The Lord Chancellor added that though he wished the law might be as represented in Whistler and Newman for the protection of married women ho found it impossible to reconcile all that is said in that case to the former, cases.
In 1804, this contested question again came under re. vision before the master of the rolls in the case of Wagstaff and Smith, 9 Ves. jun. 520.
This case Was where the testatrix bequeathed a cer* tain sum in bank annuities in trust, to permit and suffer the sister of the testatrix to take or receive the interest or dividends of the stock to her own use during her life, independent of her present or any future husband, She joined her fyuaba.nd id a deed to'charge hq¡r *440 Ufe interest with an annuity to a third person. The ^rus^00 resisted the execution of the agreement. In the argument the case of Fettiplace and Georges was relied Upon to establish that one of the incidents to the sepa» rate property of a married woman is the power of dis-potion, notwithstanding the doubts in Socket and Wray’s case. That it is not necessary to give her the power of appointment as that is incident to the quality of the property settled to her separate use. And it was insisted that Moores and Smith was decided on the circumstances.
The master of the rolls said the only question wad whether the lady has an absolute complete life estate td her separate use. If she has, then unless the former doctrine of the Court, that as to the separate property a married woman is to be considered as a feuie sole, is abrogated by the later decisions, she had a right to make any disposition she pleased of that property. That is the broad unimpeached rule. In this case, there are no words of control or of restriction. Her disposition of it must be supported. The trustee Was decreed to carry the agreement into effect.
Then followed the cases of Richards and Chambers, and Seaman v. Duill, in 10 Ves. jun. 580, 6, decided by the master of the rolls (Sir W. Grant,) in March, 1805.
The master of the rolls said he was called upon to decide the important and much agitated question, whether it is competent to a married woman by examination in this Court to relinquish the provision secured by the marriage settlement, and to transfer to her husband that property, to which he cannot make any claim, and over Which she has not reserved any disposition. He had no doubt as to the life estate. Many cases settled that. And she might also execute an appointment in favor of her husband or any other person, which appointment in the event of her death in his life, would be a •valid and effectual disposition of'the property. But the point was, whether the contingent interest which was secured to the wife, in the event of her surviving *441 $ie husband, can through the intervention of this Court, be given up by her, whilst in a state of coverture*
In examining the cases he abstained from those that relate either to the separate property, which in equity she may have j or property over which she has reserv-cd, or had given to her by the settlement, a power of appointment.
In O’Keate and Calthorpe, cited in Sperling arid Buche-fortt, S Yes. jr. 164, Lord Hardwicke did not conceive the Court had any such jurisdiction, as is- attributed to it.
He says «If she lias any power, let her exercise it $ but the Court cannot give it,” where none has been given or reserved to her by the deed or will.
The case of M’Cormick and Buller, 8 Yes. juri. 174, was the first case in which that authority lias been clearly and unequivocally exercised by the Court. This was followed by Ellis and Atkinson, 3 Bro. C. C. 346, note. And Guise and Small, 1 Anstrutker, 277. But the case of Nevisoh and Longden, in the exchequer in 1800, questioned the decision in M’Cormick and Buller, and Socket and Way, 4 Bro. C. C. 483, contradicted it.
Upon the whole the master of the rolls, was of opinion that the Court ought not to aid in such cases. That the examination and consent-of the wife in Court should not enable her to exercise any greater power over her settled property than is reserved by the settlement. The Court cannot enlarge the power. The Court dismissed the bill and the petition.
Then came Parkes arid White, 11 Ves. jun. 209, 219, 227, 232, 237, decided by Lord Chancellor Eldon, in November 1805. Irt this case the wife’s freehold and copyhold estates were conveyed to trustees, to allow the wife to receive the rents and pro-fits for her sole and Separate use, free from the debts of her husband. After her decease, to be subject to the dispositions of her will $ and in default of a will, to the child or children of the marriage, and in default of issue, to the use of the heint ■of the wife.
*442 The wife joined her husband in conveying her estates? Contained in said settlement, for life, and the reversion, by different deeds and at different times ; and the husband received the money. After some time the wife filed her hill against her husband, the trustee and the pui.ciiaser> to set aside the deeds as obtained by the control and influence of her husband, and that she had not received any valuable consideration.
The Lord Chancellor said, it was extremely important that this question should be settled once for alb That liis mind was in great distraction on this subject. Ifitbesaid that though Lord Thurlow following* his predecessors, as far back as the doctrine can be traced, repeatedly decided upon this principle, this Court has now a right to refuse it, he was not bold enough (he declared) to act upon that position.
•Previously to Whisler and Newman, Ellis and Atkinson, Pyfeus and Smith, Hultne and Tenant, Peacock and Monk, and other cases had been decided. Lord Thurlow decided most reluctantly in Ellis and Atkin-sonj and Pybus and Smith.
But he did not consider the point open. Upon principle, a woman contracting marriage, looses all the powers she had as a feme sole; and yet this Court allows her to place herself by contract in the situation of a feme sole ; and so it was at law, though that is now got rid of there. .(Seethe cases cited in a note 5 Yesey, F- 17.)
The principle is that all the words (giving powers to f,lie wife to dispose) are only an unfolding of all that is implied in a “ gift to the separate use.” Lord Thur-low has considered the point well in Hulme and Tenant and looked to the authorities, A woman having a separate estate, may give it to her husband, as well as to any one else. Though the wife’s putting her name to a bond with the husband is a mere nullity at law, it is evidence in equity of her intention, though not as the settlement required.
Lord Thurlow thought himself bound by authority tú *443 say, as sbe could have, nq other intention than to charge the separate estate, that informal instrument was such a charge 5 and he by decree executed that intention.
Lord Eldon then intimates delicately that "Whistler and Newman, decided by Lord Rosslyn, was in opposition' to all the authorities for a< century, and he could not support it against that mass of authority j (223, 226.)
Lord Eldon also in page 225, asks if it be established as it is, that the wife is at liberty to dispose of her separate estate in possession, why will not the same principle do, for the estate in remainder Í He saw no good reason..
His judgment was that a married woman- having- an. estate, to her separate use, is capable of selling it, provided she is dealing with persons competent to deal .with her, and not taking unfair advantages of her.
The next case Was decided at the rolls by the master in July, 1306; 12 Vesey, 501, Witts and Dawkins.
This was a trust under a marriage settlement,1 to pay the rents and profits according to the appointment of the wife, from time to time, in writing. In default of appointment to the wife, for her sole and separate use. She made sale of the premises, and the Court supported the sale.
The next case was decided by the master of the ’rolls, in December 1806,, , It is that of Stuges and Crop; 13 Vesey, 189.
It was decided that a married. woman is. considered as a feme sole as to property settled to her separate use, whether in possession or reversion. And as such therefore, has as much a disposing power over her reversionary interest, as over her interest in possession 5 If the.instrument do not positively restrain her power of appointment or sale. Her consent on examination, is not necessary to pass her separate property 1 and it is of use only as evidence of parting with the equity.
The last case which I shall examine from foreign law *444 books in that of Essex and Atkins, 14 Vesey, jr. 542,. decided by the master of the rolls in 1808.
This was a grant of an annuity by a feme covert ou^ a scPara^e estate, bequeathed to her, and not subject to the debts of her husband. In her answer, she fi¿a£e{] j-j. ¡je ^ transaction of her husband alone, and for his benefit alone, and that she was compelled by ill usage to execute the deed. That she hesitated long and gave her consent unwillingly, from dread of her husband. There was some evidence of ill treatment by the husband. But the weight of evidence was, that she con-, sented deliberately, upon full explanation of the business.
One of the executors and trustees gave notice to the intended purchaser, that he would not pay the dividends to any person but the feme covert; alleging her complaints of her husband's ill conduct to her, and he shewed him the will. The purchaser ho vever completed the act, and the wife signed the deed. And now the purchaser came for a specific performance of the con tract. The counsel for complainant cited and relied on the cases of Fettiplace and Georges, and the cases on that side of the question. The counsel for the wife relied on the cases of Socket and Wray, Whistler and Newman, and Mores v„ Huish,
The master of the rolls, said he did not like the purchase of the annuity after notice from the trustee. Ilia doubts arose out of Lord Rosslyn’s judgment in Moores and Huish, according to which the Court of Equity ought not to interpose in such circumstances for the purpose of giving effect to the purchase. But as it is only in equity, that the contract of a married woman, with regard to her separate property, can he at all enforced; the Court must of necessity decide upon its validity. The Court cannot leave the purchaser to his legal remedy, for he lias none. It cannot besaid he ought to have no remedy, except upon the ground that there is no valid contract. In some cases Lord Thurlow with great reluctance acted go a3 to give effect to improvident en* *445 gagements of the .wife; but did not think himself at liberty to say, the Court would not interpose where the subject was entirely of equitable cognizance. If the transaction cannot on its own merits be impeached, the declaration of the trustees cannot make it null and void. Notwithstanding Lord Rosslyn’s doubt, the established doctrine is, that a married woman can bind her separate property without the trustees, unless their assent be made necessary by the, instrument which gave her that property. Their dissent cannot have any effect, where their assent is not made necessary. And their evidence that she was unwilling, cannot he evidence lhat she acted by coercion. If upon the evidence she was a free agent, and understood what she did, the Coui’t must give effect to her contract. The Court accordingly decreed a specific performance of the contract.
In concurrence with these authorities is the doctrine in Newland on Contracts, page 25.
There was one case tried in this country, at Camden, where it was decided that the husband purchasing in ids own name a cotton gin, but for the use of the settled estate of the wife ; and he being insolvent it was decreed that the separate estate, which had the benefit should be liable. And upon -appeal the decree was confirmed.
The case of Kiernan and Spierrn was the only one Cited by the counsel, decided in the Court at Charleston.. In that case the Court was of opinion that the feme co, vert joining her husband in a mortgage of a house and lot of land secured to her by marriage settlement, was a sufficient appointment; although perhaps not such .an appointment as was contemplated.
We have thus gone through a long and laborious examination of the decided cases on this subject; and we have traced the doctrine from its first appearance in the Courts of Equity to the present time. We have seen how it stood on the British authorities for a long space of time ; how it received a temporary shock from the zeal of some Judges in later times, who were anxious to guard femes covert against their own acts, and their own *446 t00 great facility to the wishes or urgency- of their "hus* bands, and how it was re-established by still later Judges> wh° conceived it to be too bold and hazardous to depart from a settled rule of long standing, for a supposed advantage, however plausible.
■ yye have seen too that but few cases on this subject-have been decided in our own Courts, and that as far as. they have gone they have been in concurrence with the .great body of authorities wo have examined.
The truth is there has been an attempt to reconcile conflicting principles. . By the simple rulés of the common law, the union of man and wife was deemed so. complete that there was a junction of persons, minds and fortunes. The wife’s existence was absorbed in the husband’s, and he adopting her and her debts, and assuming to maintain and provide for her, became entitled to all her personal estate absolutely, and to the enjoyment, of all her real estate for life.
When in the progress of refinement and of commerce,, corruption came with them, and also great hazards to fortunes from the spirit of adventure, the caution and providence of parents endeavored to guard against casualties, by giving property to their daughters as a separate estate not liable to the debts of the husband. This at once dissolved the charm which bound up the fortunes and wills of the man and wife in one common bond of interest and affection. It was the introduction of a principle familiar to the civil law, but new to English law, that man and wife were distinct persons, with distinct properties,'and distinct powers over them.
A separate estate, free from the .control of the'7 husband and subject to the will of the wife, made her a free agent, quoad thatproperty, and she could act upon it as a feme sole. But it was soon found that wives however legally free were much under the control of their husbands, and too readily-yielded up their separate estates to them, by direct gifts, or by engagements to their creditors. This induced some of the Judges to interpose and to endeavor to control the free exercise of this *447 power of free agency, which the cliaracter of a feme sole as to the separate estate bestowed, But upon the ^fullest consideration it has been found, that upon the introduction of the principle, that femes covert could hold separate estates, free from the control of their husbands, the jus disponendi, and all the other consequences of tli holding' separate estates necessarily followed. And after an ineffectual struggle the doctrine seems to have settled down Where it was originally placed by the Court.
The result then is that a feme covert entitled to a separate estate in possession, remainder or reversion, is held to be a feme Sole to the extent of the separate property, and the jus disponendi follows of course.
She may give it to whom she ■ pleases, or charge it '•with the debts of her. husband, where no undue control is used over her. And her disposition will be sanctioned or enforced by the Court, even without the assent of the trustees, unless that assent be specially made necessary by the deed or will creating the separate estate. And this power of disposing the separate estate is not ■restricted by the deed or will, pointing out a particular mode óf disposing or charging the particular estate, unless the deed or will negatives anv other mode expressly.
Upon the fullest and most attentive examination of ^he cases, I think these doctrines are clearly made out and established.
To apply ,these doctrines founded on the decided cases, to the cause under consideration.
There was a debt, created and secured by a deed, operating as a mortgage from thé husband in favor of the wife, payable after the death of the husband, if he died first, and subject to her disposition by wilt, if she died first. It being a, debt from the husband does not alter the case. This certainly was intended to be, and was-a separate estate, not subject to the control of the husband. If it were not a separate estate to the wife, what was it ? I cannot consider it in any other light than as á separate estate. Thé ¿us disponendi followed of course^, *448 the deed creating the separate estate expressly restricted it. In this case it was contended that the deed contained such a restriction in two respects ; one in re-the assent of the trustees which was not obtain* ed ; another in prescribing the mode of the wife’s dis-p0S¡ng. (¡le separate estate, to--wit, by will, which it was insisted precluded any other mode of disposing; and consequently preventing the wife from charging the so* parate estate by her bond, as she has done in this case.
With respect to the first, the answer given by the complainant’s counsel is obvious, and I think condu* sive. The restriction is not on the wife ; it is on the husband. The deed declares that he should do no act to dispose of or encumber the property pledged as a fund to raise the sum of g 22,000, for the wife, without his substituting other property of equal value. v This is no restraint on the wife’s power of disposing the $ 22,-000, or charging the same, which power resulted necessarily from the very creation of a separate estate.
With respect to the second supposed restriction, it is answered by saying that though the deed declares the wife may dispose the separate estate by will, it does not exclude other modes. And we have seen by the decided cases, that there must be a negative to restrain the full effect of the jus disponendi resulting from the very nature of the estate. Sec Lord Thurlow’s expressions' in Pybus and Smith, 3 Bro. C. C. 349.
Besides, as was judiciously remarked by the counsel for the complainant, there were two contingencies provided for by the deed. One, that of the wife’s dying first; in which case the separate estate was subject to her disposition by will. The other, of the wife’s surviving the husband, in which case there is no restriction at all on the wife’s power of disposal. The latter is the case which has happened consequently the charge made upon the separate estate by the wife is totally unrestrained by the deed, and is valid and binding, and this Court is bound to enforce it.
It is not necessary to go through all the arguments in *449 detail. They are sufficiently noticed in the view which we have taken of the cases. Every point made, and every objection proposed in the case under consideration has been made and overruled in some or other of the cases examined.
Upon the whole, here is a case of a feme covert, for whom a separate estate is created by a deed. Its being to take effect in future is not a solid objection to her power of charging it, as we have seen expressly decided. Its being of part of the wife’s estate, while the remainder was allowed to go unrestricted to the husband, furnishes no reason for a restraint on her power of disposal ; for the marital rights would have given all the personal estate of the wife absolutely to the husband. But part was carved out of her fortune, as a separate estate ; the right of disposal was an incident to that estate. The deed does not restrain that disposal at all, in the event of her surviving her husband. She ha» survived. The restraint actually interposed was on the husband, not on the wife.
The assent of the trustees was not made necessary to any act of the wife. The express permission to dispose by will in the event of dying first, would not, if that event had happened, have restricted the wife to that method alone of charging the separate estate, as we have seen by the cases.
The mode of charging which has been pürsued in this case by the wife’s joining her husband in the bond, is not objectionable. We have seen that this mode has been sanctioned by many of the decisions. The bond is a nullity at law, and the creditor has no remedy there. But in equity it is considered as evidence of the wife’s assent to the separate estate being charged with this debt to the extent of the separate estate, but no farther j for the bond can neither touch her person, nor any other property she may have, except the separate estate. There is no evidence of any undue influence or improper conduct or control of the husband to obtain the wjfe^l assent and signature; on the contrary it Seems to have. *450 been given freely; and an affectionate friend and trus* tee seems to have bad an active and not blameable agen* °y in the transaction, as a beneficial arrangement for †]16 wife. If it had not been done, the creditors could have ehforced the demand and stripped the family of overy shilling of income, during Mr. Smith’s life, till ■the debt was paid. »
The complainant filing his bill in the life time of Mr. Smith, is not a valid objection to the claim; at most it could only be said he came too soon. At any rate be is not too soon now. But I do not think he did come too soon. See Tenant and Hulme. When the bond became due, ho had a right to sue, and the decree would at ■least have given the creditors the rents and profits during Mr. Smith’s life, and would have made the separate estate liable at his death.
As there is no provision made for children in the deed, and the wife bad the whole property in the separate estate, the whole is liable to the charge she has madé upon it.
The nature o’f the debt would have made no difference, ''provided títere had been no turpitude in it.
But it reconciles us to tho decree which must result from these premises, to find that the debt of the husband in question was not incurred for himself alone, or for unworthy purposes. It was for articles supplied partly for the family, partly for the use of Mrs. Smith herself, and partly even for the benefit of the trust estate.
The cases of creditors coming to the Court for relief under such circumstances, appear to be more favored than gifts to the husband. (See even Whistler and Newman.)
The only difficulty which occurred after what has been said, was, how the Court could reach the property in question ? In the courge of that struggle which took place in the discussion of this question in Westminister Hall, those Judges who were most reluctant to make the separate estate of the wife liable for the husband’s-debts, *451 upon her pledge of the separate estate for that purpose» raised .up that difficulty,, when the property consisted of. dioses in action. It was- said that this Court generally acted in personam ; that to be sure in the case of a feme covert with a separate estate, the Court could not act in personam, and- must therefore act upon her- separate estate; but if that estate consisted of dioses in action, a levy could not bo made upon them, any more than it could in any other case of choses-in action, and this. Court could not touch it.
The history of this doubt and the- dianges of opinion upon it, is singular.. In the case of Taylor v. Jones, 2 Atk. 600, Lord Hardwicke in 1743, had no difficulty in decreeing stock to be sold and the produce to be applied to the payment of the debts of the husband. ‘
In the case of Hulme and Tenant, 1 Bro. C. C. 16, decided by Lord Thurlow in 1778, he .reluctantly, but acting under the force of authorities, made the separate estate liable, and decreed the income of the real estate to be applied to the payment of the debts, and expressed no hesitation as to- any personal estate- j on the contrary, tb.e acting upon the real estate where the wife had. not been examined in Court, as to her-assent to hind or dispose of the real estate, was, considered the greatest difficulty 5 but that was got over. But in the case' of Dundas v. Dutens, decided by Lord Thurlow in 1790, (1 Ves. jun. 196,) he doubted if this Court could act upon dioses in action, and expressed himself very strongly on the subject. Yet in the following, year in the case of Pybus v. Smith, 3 Bro. C. C. 340, 6, which was- a case of separate estate, consisting of real estate- and money in the funds, Lord Thurlow, considering a feme covert with a separate estate to be a feme solo,. quoad that, declared the whole to he liable to her husband’s debts, for which she had agreed to make them 'liable.
This case was followed by a series of others in support of it, till the time of Lord Alvanly and Lord Ross-Jyn, who did not like the doctrine of making separate estates liable, and strove to get rid of the old authorities. *452 Eord EWon on his first coming into the Chart of Chan-eery, paid deference to these later opinions ; and in the case °f Nantes v. Corrock, decided in 1803, and report-ed in 9 Vesey, 182, expresses the same doubt and difii-culty about making the separate property, consisting of s£ocjc or 0ther choses in action liable to the. process of the Court; and he statéd that the cases of Hulme and Tenant, & Pybus & Smith, had been shaken by L’d Rosslyn.
But when Lord Eldon had sat longer on the bench, and had occasion to consider the subject, and examine the authorities more fully, he became satisfied that it would be too dangerous to depart from the long series of decided cases, and to adopt the new opinion of Lord Rosslyn. He preferred the maxim of, stare decisis, in order that the law might be settled and known, to any supposed improvement. Accordingly in his subsequent decrees he abandoned the doctrine of Lord Rosslyn, and adhered to the old decisions of Lord Hardwicke and Lord Thurlow, and made the separate estate of the wife, of whatever it consisted, liable to the disposition of the wife, either in favor of her husband, or to pay his debts, '
And I do think it would be much too hazardous to Venture to change the law at this day.
Upon the whole, after a very strict éxamination of the authorities, and upon great consideration, I feel myself constrained to decide in favor of the complainant.
Cofnplicated and extensive as this subject is in itself, and as it has been made by the ingenuity of counsel, and by the difference of opinion of a few of the Judges from their predecessors and successors, I have however come to a conclusion entirely satisfactory to my judgment, whatever my feelings may he.
If I had any serious doubts, I would recommend an appeal, to have the question solemnly settled. But I haye none, which would justify my recommending what would only be a new source of delay and expense. The parties however will exercise their judgment upon that point, and with my entire concurrence in whatever they *453 may determine to do : It is therefore ordered ’ and decreed that the amount of this debt be paid out. of the separate estate, or of the sales thereof, as far as the may extend towards the payment of the debt.
From this decree an appeal was made on the following grounds :
1. That according to the principles of the common law, the deed or contract of a married woman is a mere nullity; that where they are enforced by equity, it is only in reference to their sole and separate interests and estates secured to them by marriage convention, when it is also the object and intention of such marriage convention, either positively expressed or seen through the medium of necessary implication, to vest in them the interests & estates and to confer on them in relation thereto the powers, privileges and free agency of a feme sole ; and that as in the present case, so far from its having heen the object or intention of the parties to the settlement either expressed or implied, to subject the property in dispute to the acts of Mrs. Smith, as a feme sole during her coverture, the manifest and only object of the settlement was to preserve one moiety of her paternal fortune, namely the 22,000 dollars, (the other'llalf having heen given up to her husband,) entire and free from diminution or charge at the dissolution of the marriage for her absolute and individual benefit, if she survived her husband, and subject to the use of his will (which could only he operative at the dissolution of the marriage,) if he survived her, the bond under these circumr stances was as much a mere nullity as if she had been without a settlement, and had intended to bind by it the interest she had after the death of her husband, in her paternal inheritance.
2. That even supposing (what is not admitted,) Mrs. Smith had a sole and separate interest in the property during coverture, notwithstanding the deed mentions his sole and absolute use in case she should survive her husband, when by becoming again a feme sole, whatever unfettered rights she then had must necessarily be soli) aud absolute, yet as the only act she could perform dur-j,ig coverture under the positive terms of the settlement was limited to an instrument in nature of a will wit-nesse(j hy two credible persons, and such being ambulatory and recoverable, and to be executed in the pre=-sence of respectable persons was (consistently with the objects of the settlement) calculated to protect her rights against the influence of her husband, the terms requiring this mode were emphatically a negative to any other which would expose her to his influence, and that therefore the execution of the bond, which is a palpable departure from the mode prescribed is ipso facto, null and void, both as a bond and contract to bind her interests,
*453 HENRY WlEEIAM DeSATJSSURE..
3. That Mi's. Smith, during her coverture, having no other powers under the settlement incidental to a feme sole, except that of executing a deed in nature of a will, which could only affect his interests after his death, and was recoverable during her life, the bond executed by her was a mere nullity both in law and equity, and-could not be rendered valid by the attestation or assent of her trustee, Mr. Frost. •
4. That supposing this act binding on the interests of Mrs. Smith agreeably to the decrees of the Chancellors of England, (which is not admitted,) yet as the only cases which cari at all bear on the circumstances of this case have occurred since the revolution and have no binding authority in our Courts, and as the rule has been condemned by those Chancellors, and submitted to only from necessity, and as our Courts of Equity have never yet received the doctrine to the extent carried by the English cases, the subject is « res íntegra5’ in our Courts, and they ought not to adopt principles which the British Chancellors regard as wrong in their origin. 1
■ 5. Because the decree is in other respects contrary to fiic law of equity.
K. L. SimoNs, defendant’s solicitor.
*455 lihe appeal came to a hearing in March, 1812. The ■Court of Appeals took time to deliberate. At" the sitting of the Court of Appeals in March 1813, the Chan*-cellors being divided in their opinions, delivered them Separately.
As this cause is of great importance, and the subject has never before in this country received a judicial de-cisión, and as I differ from the opinion delivered by the Circuit Court, which is intitled to great weight, on account of its very able examination of the subject and the strong support it derives from precedents, it is proper that I should state fully the reasons and grounds on which I think the decree ought to be reversed. The facts which appear to me most material are these. On the marriage of the defendant, Mrs. Smith, a deed was executed by her husband, by which he agreed in consideration of her having previously conveyed to him a considerable estate, to secure to her sole and absolute use (if she should survive him) the sum of $ 22,000, with a power to appoint the same by will, (if she should •die before him) to such persons as she should see fit. Some time after the marriage, Mr. Smith being indebted to Messrs Robert and A. Ewing, and being threatened with a suit, prevailed on his wife to join him in a bond to them for the amount of his debt, for the purpose of charging her separate estate with the payment ■ thereof. Mr. Smith has since died, and this bill was brought by the complainant to compel Mrs. Smith to pay the debt out of the property secured to her by the settlement. It will not be necessary to consider all the questions which have been made in this case, because on some of them I concur with the decree. I agree that the estate settled on Mrs. Smith must be regarded as a separate estate. It is expressly declared to be to her sole and absolute use, and although it was only eventual, yet I can see no reason why such an estate should not bo subject to the disposition of a married woman, (if the power is given to her,) as well as one in possession. I therefore acquiesce in the cases as far *456 as they decide on this point. But the last decisions on this subject, and indeed some of the earlier ones have extended the power of a married woman over her sepa-ra*e es^e to a length to which my judgment cannot go. The doctrine laid down by them is that feme covert with respec^ jier separate estate, is a feme sole ; that her power of disposing of it is not derived from any deed or will; but is incidental to such an estate, and therefore that the exercise of this power shall not be confined to any particular mode, unless every other mode is excluded. I cannot assent to this doctrine in this great extent, because it appears to me to be incompatible with the established principles of our law, and because it does not appear to be authorised even by the principles of the civil law on which it is said to be founded. It is indeed true as a general rule, that an absolute right of property, gives an absolute right of disposition; but this rule is only applicable to persons of full legal eda-city ; and it is strange that any English Judge should have ever lost sight of the common law so far as to apply it to a married woman. By the common law the legal existence of a married woman is suspended during the marriage, and therefore all contracts and acts done by her, except as an attorney to her husband, are void. She may indeed divest herself of her interest in lands, either (as in England,) by joining with her husband in levying a fine, or (according to our mode) by executing a separate release. She must however in either case be privately examined as to her voluntary consent. But it is said this subject is regulated by the rules of the civil law. Let us see how far it is supported by those rules. By the civil law the estate of a married woman consisted generally of two kinds- — .that portion which wras settled on the marriage was called her dowry, and that which was reserved was called her parapharnalia. The dowry was intended as a common fund for the maintenance of the family, and was subject to the use and management of the husband during his life, but the right of property continued in the wife, and if she survived. *457 him, the whole dowry became hers again absolutely. No part could be aliened during the marriage, unless some extraordinary case required the alienation, such as the redeeming out of captivity, or out of prison the husband, the wife, or their children, or other necessary Cases ; but in every case the alienation was not permitted, except by a decree of Court, the Judge enquir-ing into the merits and circumstances of the case. The paraphernal estate of the wife was all such part of her pi’operty as was not settled upon the marriage, and ovel* this it appears her power was absolute. The rents and profits of it were exclusively her own, and she might alienate or charge it in any manner she pleased, without the consent of her husband. But we see the same law which takes away from the husband all right over the paraphexmal estate condemning this unbounded liberty allowed to the wife of enjoying such estate independently ol ner husband. I have extracted this account of the civil law from 1 Domat, 159 to 172, who furnishes the original authorities for evei’y part from the digest and the code of Justinian. It is worthy of remark here, that the portion settled on Mrs. Smith, is precisely the dowry of the civil law. It was subject to the use and management of her husband during his life, and at his death it was to become hers absolutely. If the civil law therefore in all its extent was to be the rule on the subject, this estate was not alienable during the marriage unless for some imperious cause, and under the sanction of this Court, and the bond given to the complainant by Mrs. Smith would be void. But it seems that only so much of the civil law as might be injurious, and no part which might be beneficial to a married woman, has been adopted by the English Court of Chancery. By its decisions the estate of a maimied woman, intended as a provision against nxisfoi*tune, and completely secured from the legal power of a husband, may by his influence or his authority over her, be squandered in wasteful living or ruinous speculations, and she has no protection in the guardian care of a Court, nor any resource in a dowry *458 which is unalienable. Where is the equity in this pat> tial adoption of the civil law, and this relinquishment of common daw principles ? I have searched in vain for the reasons to justify it. I find indeed reasons for the civil law rule. Which never existed in England, and still less jjere_ Among the Romans, the matrimonial bond was of precarious obligation ; divorces were allowed on the. most frivilous pretexts ; according to Cicero the husband might, without any judicial sanction, repudiate his wife by saying to her in .the presence of witnesses, “ restuáfc tibi habito, cede donio,” and even the wife might divorce herself by pronouncing the words “ valeas, tibi ■habeas tuasres, reddas meas.” This facility of divorce :and this distinétion of persons between husband and "wife, sufficiently account for the law of the Romans which considered the wife as a feme sole with respect to her separate property. But the matrimonial bond in England can .only be dissolved by an act of Parliament, and here only by death. When we see then even the •civil law, notwithstanding the feeble tics by which marriages Were bound, condemning the uncontrol.ed power •of a married woman over her separate estate, why should we adopt a rule so dangerous to -the peace of the married .state, so inconsistent with the concern which is manifested in other respects for the interests of married Women, and so repugnant to the principles of the common law ? The only answer which can be given, is, that the law has been so settled by English Chancellors, and therefore this .Court must be bound by it. This raises the very important question, how far the decisions of the English Court are authoritative in this: By our act of assembly passed in 1721, for establishing a Court of Chancery here, it was declared « that the said Court shall adjudge and determine all causes according to the known and established rules of the high Court of Chancery in South Britain. This act it must be admitted, adopts the English system of Equity as far as it was established in 1721, ahd the principles then settled wbie 40 doubt obligatory here until the revolution,, *459 and are indeed still so as far as they arc compatible with the change of government. But neither before the revolution, no more than since, was this Court ever bound to a servile adherance to the precedents of the English Court. This. Court ought to be independant of every other in- the exercise of its. Judgment., I do not inean to say that we may adopt other rules for judging. ©od forbid, that I should assume such a power., I feel already the responsibility sufficiently great, of expounds ing laws, without encreasing it by making them. I would not then undertake to alter the settled principle, that a married woman may alien or charge her separate; estate Under a power given to her to do so 5 for that principle was.settled, I find,, before the year 1721 ; but in- applying that, or any other principle, to subsequent eases, I should feel that I was not fulfilling-the purpose for which my country has been pleased to place me here, if instead-of exercising-my own judgment in-the best manner I Could in construing and applying- any pxdnciple to cases- as- they occur;, I should implicitly follow the'construction given, to. it in similar cases by the judge of a foreign Court, and obey his decisions as verba magistfi.. I have a high and grateful sense-of the value of the illustrations-which both law and equity have received and áre. still receiving from the great light and experience of English Judges ; but I may he allowed to say with the: most enlightened of them, (Lord Mans - field) te that although precedents serve to illustrate principles, yet the law depends upon principles.” The present case affords also a peculiar latitude for the-free exercise Of the judgment, for although the broad rule as insisted on for the complainant was.laid down by L’d Thurlow as early as 1778, in the case of Hulme and Tenant, yet in the subsequent cases- of Frederick vs. Hartwell, determined in 1785, Socket and Wray, deter-; mined in 1793, Whistler and Newman, in 1798, and Mores andHulshso late ai 1800, we see other judges of the same Court dissenting from this rule, and laying down a more limited one, which clearly shews that the- *460 Jaw on the subject was not considered by them as having any fixed certainty before, or they would not have felt at liberty to depart from it',* and even in the case of Hulme and Tenant, it appears that Lord Bathurst had before given a different opinion from Lord Thur-jQW an(j dismissed the bill, I might further add that even to this day, notwithstanding the decisions which have been thought so conclusive for the complainant, the law is still unsettled j for Mr. Sugden, in a late excellent treatise on powers, after reviewing all the cases on this subject, concludes by saying “ that the distinctions taken in them, appear so extremely refined and subtle, that it is almost impossible for a practitioner to advise confidently on any case, where the very words have not received a judicial determination.” Sugd. on Powers, 108. I think therefore, it may be fairly said, that the ground of authority is taken away from any precedents by which this Court could be hound. But if it were not so, and if those relied on for complainant had their full weight, I should think, even on the ground of construction, that the power of Mrs, Smith over her separate estate was restricted to an appointment by will, and that she could not charge it with debts. It is admitted in the strongest of those cases that where the power of disposing is exclusively restricted to a particular mode, it cannot be exercised by any other. It is true there is no express restriction in this case, but such an intention appears evident to me from the nature of the settlement. Mrs. Smith’s power of appointment was confined to the event of her dying before her husband ; she was not to have, the absolute use of the fund provided for her, except, in the event of her surviving him. This was intended then as a future resource, for future enjoyment, and therefore a power of alienating or diminishing it in any way could not have been contemplated, for this anticipation of her interest would defeat the great object of the settlement. But although this case might be thus decided on the ground of construction without deviating from thepre- *461 cedents, yet this ■would leave the principal questions undecided, and it is of great importance to the community that some fixed principles should be laid down by the Court for the future government of the subject. I can see no difficulty in doing this, for considering the subject as res integra in this Court (which appears to me mani* fest from the view before taken of it,) we have only to adopt those principles which have been recognised as the most true and most safe by all the Eng. Chancellors from Lord Thurlow down to Lord Eldon, although they have not all acted upon them. In the case of Pybus and Smith, (3 Bro. 340,) Lord Thurlow after deciding in favor of the conveyance of a married woman of her separate estate under a general power, declared « that if the point were open, he should have thought a feme cp-vert, who had a separate estate should not part with ifc without an examination.” Aftd in a preceding case of Ellis and Atkinson, he had actually required an examintion. In the case of Frederick and Hartwell, Lord Kenyon, then master of the rolls, insisted on the wife’s coming into Court to be examined whether her deed for appointing her separate estate was executed under influence or not. In Socket and Wray, (4 Bro. 483,) and Whistler and Newman, (4 Ves. 129,) Lord Alvanly and Lord Bosslyn complain of the rule which placed femes covert, on account of their separate estates, wholly on the footing of femes sole, and refuse to inforce it in th£ extent before laid down. In Sperling and Rochfort, (8 Ves. 164,) Lord Eldon while he recognizes the rule laid down in Pybus and Smith, expresses a wish “ that the law was as represented in Whistler and Newman for the protection of married women.” And in the case of Parker v. White, (11 Ves. 209,) so late as 1805, he declares «that his mind was in great distraction on the subject; that no Judge ever felt so strong an inclination to say the act of the wife should not avail, as Lord Thur-low had in Ellis and Atkinson, and more particularly in Pybus and Smith, in which case his reasoning was unanswerable, if the point had been ojfcn.” « That upon *462 principle, A woman contracting marriage loses all the powers she had as a feme sole, and yet this-- Court allows *ler place herself by contract' in the situation of a. feme sole.”’ And he adds that Lord Thurlow had said “ that upon true principle, if the Contract makes her a' feme sole, her faculties as- such are to be collected from the terms of the instrument which- makes her such.” Herh then We see the English Chancellors, although differing as to the obedience which they owed to precedents, yet all Uniting in Condemning, the absolute dominion given to married women over their separate estates, and all concurring in recognizing and: declaring what ought to be principles- I may therefore confidently say that even if Lord Thurlow and Lord Eldon were now1 sitting on this bench, ánd called on to settle the law for ■ this community, they would settle it on those; principles., ¡Instead then of opposing “their high authority,. I feel expressly authorised by them in declaring the opinion$, that a married woman who has a separate estate cannot part with it, or charge it in any way, without an examination 5 that as hy marriage she looses all the powers of a feme sole, a separate éstate does not confer'all those-powers on her, and that therefore the power of appointing such estate must he expressly given, and the mode-prescribed, be strictly pursued. As the bond given hy Airs. Smith has not these sanctions, I am of opinion that it ought not to be enforced, and that the decree of the Circuit Court should he reversed.
Signed, Thomas Watíe-S.
I concur in this opinion.
Signed, SY. James.
1 concur iii the opinion fdr reversal. The decree is conformable to the late English decisions ; but I consider the case as res integra in this country and that to sanction4the principle in the extent it is laid down in those decisions would be to defeat the great object of marriage settlement, the ..protection of the property for the wife *463 and children. To free from the restraint of marriage settlements, the acts of the wife arising from the influence of affection to the husband would render settlements ineffectual in a point in which they are most necessary, and it is more consistent with the security of the property to the wife and children, the purpose intended by marriage settlements, to restrain the acts of the wife than to consider her as a feme sole.
Theodore Gaixxajuj.
The act of the legislature of 1721, establishing the Court of Equity in this state (then province) says that « the said Court shall proceed, adjudge and determine •iu all cases brought into1 said Court as near as may be according to the known ■ laws, customs, statutes and usages of the kingdom of Great Britain, and also as near as may be according to the known and established rules of his Majesty’s high Court of Chancery in South Britain.” If this act be not repealed, which I presume will not be contended, the decisions of the English Courts of Chancery, anterior to the revolution, are imperatively to govern in our Courts of Equity. If this he not the case where exists the necesity or use of gentlemen of the bar, to incur the expence of purchasing such vast quantities of the reports of that country, and such consumption of the time of the Court in attending to the quotationsfrom them, and what landmarks would .professional gentlemen have, by which to form their opinions, or direct their client». I admit that principle ^preferable to precedent to a certain extent, but a bad principle uniformly acted on and acquiesced in, is to be preferred to fluctuating decisions, which are liable every day to change, and frequently depend upon the extent of •the Chancellor’s mental faculties, and legal acquire-ments. It is contended that the English authorities should not govern this case, but as res integra, the Court has aright to decide it upon the priciples of the civil law. I should myself be glad t» know by what authority this Court can assume the doctrine of the .civil lav/. *464 There exists no act of the legislature vesting that power iQ them, and as far as my knowledge extends, they have not been incorporated into our system of ju-x'isprudence further than they have been adopted by a series of decisions not repugnant to common jaw principles. The pandects of Justinian, so far from being considered as authority, are scarcely read by one student in twenty, but chiefly by gentlemen of extensive information, more for amusement than use. But admitting those principles should prevail here, it does not apply to this case, and hard indeed would be the situation of the complainant, were his inte# it to be destroyed for the purpose of establishing a new principle. The civil law admits that a woman’s dowry may be conveyed or disposed of, for the purpose of releasing her husband from gaol, which is precisely the present case. The bond given by the defendant to the complainant was for that express purpose, with the full consent and approbation of her only acting trustee. But 1 will go further, and for arguments sake only, put the British decisions out of the question, no man will surely say that our own decisions are to have no weight. The case of Mrs. Eveleigh, which I believe was unanimously decided by a full bench, was precisely in point with the present. In that case a cotton machine was purchased for the use of the trust estate, and the Court decreed that the trust estate should pay for it. In this case the articles supplied by Mr. Ewing were for the use and benefit of the trust estate, and it is my opinion that they should be paid for out of the trust estate. It is further contended that if the doctrine contained in the deci’ee should prevail, that marriage settlements would be a mere nullity $ that according to the opinion of a learned Chancellor, a man can kick or kiss his wife into any measure; but I cannot myself conceive that an examination before a judge would have a tendancy to extinguish the fears of being kicked, or the hopes and desire of being kissed. Nor do I believe that such examination would move effectually prove the voiimtary *465 declaration of a woman, that the legal execution of a bond entered into with the consent and approbation of her trustee. I am therefore of opinion that the great weight of authorities is in favor of the decree, and that it ought to be affirmed.
Bee, Grxmice and Simons for appellants.
Ford and Pringue for respondents.
Signed, W. Thompson.
I have reconsidered the decree given by the Circuit Court, and adhere to the opinion there expressed, for the reasons therein given. I am therefore for affirming the decree.
Signed, Henry Wjxuiam Desatjssjjre. .
March, 1813.
Three of the Chancellors being of opinion that the decree was erroneous, it was ordered that the decree should be reversed.
Chancellor Hugh Rtjtxeuge died early in the year of our Lord eighteen hundred and eleven, and Thomas Waties, then a Judge in the Court of Common Pleas and Sessions, was elected a Judge of the Court of Equity in-his room, at the session of the Legislature in, December, 1811.
Chancellor Waties held the Circuit Court óf Equi* ty in Chai’leston, in February, 1812.